**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2645-24

STATE OF NEW JERSEY,

     Plaintiff-Appellant,

v.

JASON M. O'DONNELL,

     Defendant-Respondent.

_____

Argued January 21, 2026 – Decided July 30, 2026

Before Judges Gooden Brown, DeAlmeida and Torregrossa-O'Connor.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 21-02-0011.

Regina M. Oberholzer, Deputy Attorney General, argued the cause for appellant (Jennifer Davenport, Acting Attorney General, attorney; Regina M. Oberholzer, of counsel and on the briefs).

Leo J. Hurley, Jr., argued the cause for respondent (Connell Foley LLP, attorneys; Leo J. Hurley, Jr., of counsel and on the brief; Alexa C. Salcito and Jared F. Hotchkiss, on the brief).

PER CURIAM

By leave granted, the State appeals from portions of a March 7, 2025 discovery order entered in the Law Division requiring it to provide documents to defendant Jason M. O'Donnell to support the one-count State Grand Jury indictment returned February 3, 2021, charging defendant with second-degree bribery, N.J.S.A. 2C:27-2(d). The charge stems from allegations that during his 2018 mayoral campaign, defendant accepted $10,000 in cash from Matthew O'Donnell (MOD) (no relation) in exchange for a promise to appoint MOD tax counsel for the city of Bayonne. Defendant did not win the election. MOD cooperated with law enforcement in exchange for leniency.

The case was previously before us when defendant moved to dismiss the indictment, contending the bribery statute did not apply to him "because it does not cover candidates who accept improper payments but are not elected." State v. O'Donnell, 255 N.J. 60, 66 (2023). The trial court agreed and dismissed the indictment. Id. at 67. Based on our interpretation of the bribery statute, we reversed and reinstated the bribery charge. Ibid. Our Supreme Court affirmed and "remand[ed] the case for trial." Ibid.

The subject of this appeal is the propriety of portions of the March 7, 2025

discovery order[1] entered during the remand requiring the State to produce "all communications" pertaining to the consensual intercepts and consensual intercept authorizations sought in defendant's investigation as well as "[a]ll intra-agency communications" related to defendant and defendant's investigation and all communications related to MOD's cooperation, including his potential liability, cooperation credit and other benefits, sentencing, potential criminal liability, and "all internal assessments thereof."[2] Because we conclude the discovery order was overbroad, we affirm in part and reverse in part.

I.

The Supreme Court recounted the following facts from the grand jury presentation:

> In February 2018, an individual who cooperated with law enforcement met with defendant . . . . At the time, defendant was a candidate for mayor of Bayonne. At the end of the evening, defendant asked for $10,000. Defendant said that he needed street money and that the individual would "be his tax guy." Candidates for office ordinarily use "street money" for get-out-the-vote efforts and related activities. See N.J.A.C. 19:25-12.6(a).

---

[1] The order clarified a prior discovery order entered on September 27, 2024.

[2] The judge later modified the paragraph requiring the State to provide "all internal assessments" and instead required the State to "identify" and "submit a privilege log as to internal assessments not subject to disclosure" for the court's review.

A-2645-24

During the investigation that followed, the cooperator met with defendant, spoke with him on the phone, and recorded their conversations. The two met again on April 23, 2018 at defendant's campaign headquarters. During the recorded meeting, the cooperator said, "[S]treet. When do you need that, next week?" Defendant responded, "[T]he weekend before [the race] is good." Defendant added, "Well[,] it's gonna be easy[,] because you'll be the tax attorney."

On May 3, 2018, investigators gave the cooperator $10,000 in cash to give to defendant. The money was inside a white Baskin-Robbins bag with pink lettering. During a recorded conversation at campaign headquarters later in the day, the cooperator said, "I just want to be your tax guy." Defendant responded, "Yeah done. That's, that's easy but I need." A video of the meeting depicts defendant holding the Baskin-Robbins bag.

Defendant lost the election.

[O'Donnell, 255 N.J. at 67-68 (third alteration in original).]

The cooperating witness was identified as MOD. As a result of discovery motions filed by defendant, the State provided discovery showing that during defendant's mayoral campaign, MOD, an attorney who was under State and Federal investigation for allegedly running a "pay to play" criminal enterprise, participated in multiple "proffer sessions" with Division of Criminal Justice Investigator Kristin Maier, Deputy Attorneys General (DAsG) Pearl Minato, Anthony Robinson, and John Nicodemo, and FBI Special Agent Sean McCarthy,

4

as well as MOD's own defense attorneys. MOD sought favorable treatment in any criminal prosecution.

During the first proffer session, which occurred on January 31, 2018, MOD identified twelve politicians he had dealt with in the past, including defendant. MOD recounted he had first met defendant "while at a golf outing in Monmouth County." Defendant had allegedly asked MOD for "financial support" in anticipation of a February 1, 2018 fundraising event "since he [was] scrambling for money for his upcoming election in May." In response, MOD allegedly told defendant "they would schedule a meeting in the coming weeks to discuss and . . . may start by giving him $10,000."

During the second proffer session, which occurred on February 16, 2018, among others, MOD called defendant. They had spoken two weeks prior through defendant's campaign consultant "about setting up an event for [defendant] in New York City at the Grand Havana Room (expecting cash)."[3] In an investigation report, Maier described the call as follows:

> [Defendant and MOD] spoke about having a meeting at an Italian restaurant in NYC and that he will "text Mike now[."] [MOD] told [defendant] as for the 2019 town [re-evaluation] by Appraisal Systems, they want to throw him a fundraiser at the Grand Havana Room. [Defendant] said he won't be able to make an event

---

[3] It is unclear from the record what "expecting cash" means.

being held on 02/28/18. [MOD] stated he spoke to "DPR" last night and hopefully they can get together in Belmar with Mike and "Vin."

In response to questioning, MOD characterized defendant as "desperate for money right now."

During the fourth proffer session,[4] which occurred on February 27, 2018, among other things, MOD stated "he had spoken with [defendant] on [February 21, 2018,] while at a dinner in Manhattan," and "[o]n the way home from the event," defendant allegedly "asked [MOD] for $10,000 in street money (cash) for his upcoming general election." Later in the proffer session, when asked for a "list of potential targets," MOD included defendant, stating defendant would accept $10,000 in cash "directly to him" for his April fundraiser.

A screenshot from a text message showed that on April 23, 2018, at approximately 11:51 a.m., MOD texted Maier to confirm he had a meeting scheduled with defendant. Maier responded at 12:01 p.m. that she would "pass on [the information] and someone else [would] contact [MOD]." In a corresponding investigation report, Maier explained she was passing the information along "to someone else to follow up" because "[she] was not working." Maier then notified Lieutenant Michael Fallon. In a second

---

[4] The proffer sessions did not all reveal evidence pertinent to defendant.

A-2645-24

screenshot, Maier sent a text at 12:48 p.m. stating, "He just texted me he does in fact have a meeting planned for tonight. I told him I would pass it on to you guys and someone else would reach out to him to coordinate plans." A response from Fallon at 1:21 p.m. asks, "Is Ho with you?"[5]

At 1:36 p.m. the same day, an email from Minato to Robinson, Nicodemo, Assistant Attorney General (AAG) Anthony Picione, and DAG[6] Jeffrey Manis informed them:

> FYI, spoke to [MOD] briefly. They have decided to move forward with [defendant] tonight. There will be a meeting of just MOD and [defendant], former Assemblym[a]n and now mayoral candidate for Bayonne. At the meet, MOD will hand to [defendant] donations consisting of a few checks, all of which are legitimate. MOD will then engage [defendant] in conversation regarding other types of donations, e.g. street money. The sole purpose of tonight's meet is to generate conversation of illegal financial support to [defendant] in his upcoming bid for the [m]ayoral seat.

Picione responded about an hour later, at 2:12 p.m., indicating MOD may be meeting with another target "tonight." Minato's response was redacted. At 2:25 p.m., Manis replied:

> If we are indeed proceeding with in effect a third spin-off operation tonight, this time involving Bayonne

---

[5] Ho Chul Shin is another Division of Criminal Justice Investigator.

[6] Manis is referred to as both a DAG and an AAG in the record.

A-2645-24

[m]ayoral candidate, [defendant]. Do we want to open a new matter and also have a new consensual authorization with [defendant] (and others as yet unidentified) as the target?

At 2:43 p.m., Picione responded:

Yes, nice pickup Jeff.

Renee [Napa] – can you open a new matter in InfoShare?

Case name - Jason O'Donnell
Description - Allegations of bribery, illegal campaign contributions and pay to play involving [defendant], [m]ayoral candidate for City of Bayonne.

Please assign to DAsG Minato, Robinson and Nicodemo.

Team - you have oral authority to proceed with the consensual. Once I get the written form, I will sign it.

Good luck!

Picione responded again at 2:47 p.m., stating:

BTW – I haven't yet received any of the consensual forms. If someone could draft the [three] (the one starting today and the [two] from last week) and send to Renee and I, I will then sign. Let's not let them get too far behind – it's easy to lose track of them in a multi-pronged case such as this. And another thing that should be calendared – when each consensual needs renewal. Again, easy to lose track of. Thanks all.

Subsequent emails from Manis, Nepa, and Fallon, sent at 2:52 p.m., 2:53 p.m.,

and 3:16 p.m., respectively, were redacted. At 3:18 p.m., Nicodemo emailed Picione, "Don't wanna duplicate . . . but has anyone drafted the Jason O'Donnell consensual? Please let me know and I will draft one if need be."

At 4:00 p.m., Picione signed a consensual interception authorization form approving a thirty-day consensual intercept requested by Maier, targeting defendant "and as yet unidentified individuals." MOD was identified on the form as the consenting party and the crimes listed included official misconduct and bribery. At 8:05 p.m., Robinson emailed the following update:

> All –
>
> I just spoke with Dan O'Brien, he briefed Paul Morris and asked me to update you. He tells me that tonight's meeting between MOD and [defendant] went off as planned. MOD gave [defendant] $8,400 in legitimate contribution checks. [Defendant] then told MOD that MOD would be his tax guy should he win the election. [Defendant] added that he would need MOD to get him another $10,000. The timing of that payment should be mentioned in the recording, which Ho will be downloading this evening.

The following day, at 8:42 a.m., Robinson added the following to his prior update:

> I just watched the video. Shores up MOD[']s recollection. [Defendant] asked for the "street money" the weekend before the election.
>
> MOD says that he can provide it on condition that

9

A-2645-24

[defendant] gets rid of a certain city employee. [Defendant] says he doesn't know her but that he plans on cleaning house, which, "should be easy, because you'll be the tax guy."

The April 23, 2018 meeting between MOD and defendant was memorialized in an investigation report prepared by Shin on May 2, 2018. The report noted that "[a] consensual authorization was previously approved," and described the checks MOD was to provide defendant. The report further provided, "At the debrief, MOD stated that after giving [defendant] the contribution checks, [defendant] asked for the 'street money' by the following week. [Defendant] assured MOD that MOD will be the tax attorney."

On May 1, 2018, MOD again met with investigators. At the meeting, MOD called defendant and confirmed that they were to meet mid-morning on May 3. The call was recorded. Two days later, on May 3, 2018, investigators called MOD at approximately 9:24 a.m. to confirm the meeting details. Later that morning, at around 10:14 a.m., Shin and Maier met with MOD, searched his vehicle, and provided him with $10,000 in cash in a paper bag. MOD put the bag in a second Baskin-Robbins branded paper bag, and the investigators observed him as he handed the bag to defendant with a box of doughnuts. The exchange was recorded. MOD stated defendant thanked him and promised him

work if he was elected.[7]

Picione and Manis subsequently approved ten other consensual intercepts between 2018 and 2019, targeting defendant for official misconduct and bribery. MOD was identified as the consenting party in all ten consensual intercepts.

On remand, defendant moved to compel additional discovery, originally requesting:

> all discovery related to each and every investigation that involved [MOD] as a cooperating witness for the State; all information, communications, and documents related to any "attorney proffer" sessions; . . . complete and unredacted copies of the State Grand Jury transcripts from the presentations on January 20, 2021 and January 27, 2021 involving or related to [MOD] and his cooperation with the [S]tate[;]. . . all records from the FBI related to [MOD]; . . . [and] all billing records of O'Donnell McCord, P.C.

Defendant further requested all materials related to the consensual-intercept authorizations in the prosecution; all communications between investigators and prosecutors related to the investigation of defendant and MOD's cooperation; all

---

[7] Also attached to the investigation report documenting this interaction is a series of text messages between defendant and MOD from late 2017 to the date of the meeting. The messages involved defendant's and MOD's plans to meet, defendant sending a flyer of an event he was hosting, and defendant confirming the May 3 meeting.

communications between the State and MOD's attorneys; and <u>Brady</u>/<u>Giglio</u>[8] materials for prosecutors related to the case.

The judge heard argument on the motion on September 10, 2024. To support his position regarding production of the consensual intercept communications, defendant asserted discovery regarding those communications was critical to determine if there was a legitimate basis for authorizing the consensual intercept. The State countered it provided sufficient discovery to satisfy the requirements for a consensual intercept under the New Jersey Wiretapping and Electronic Surveillance Control Act (Wiretap Act), N.J.S.A. 2A:156A-1 to -37, and <u>State v. Martinez</u>, 461 N.J. Super. 249 (App. Div. 2019).

In an oral opinion, the judge ruled all intra-agency communications regarding defendant's investigation were relevant and discoverable. Further, because there was a legitimate question as to the circumstances surrounding Maier's ability to present an authorization on a day she was out of the office, defendant was entitled to all information surrounding the approval of the April 23, 2018 consensual intercept. The judge reiterated the State was to produce a privilege log of any attorney-investigator communications for the judge's

---

[8] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).

review.[9]

The judge memorialized her oral decision in a written order dated September 27, 2024.  Pertinent to this appeal, the order required the State to:

> a. Produce to [d]efendant all communications, including but not limited to emails and text messages, by, between, and among the State's investigators, DAGs[,] and any third parties, that are related to the consensual intercepts and/or consensual intercept authorizations that were sought and/or authorized in the investigation of . . . [d]efendant; . . .
>
> b. All intra-agency communications, including but not limited to emails and text messages by, between[,] and among State investigators, or between State investigators and any third parties, related to . . . [d]efendant, the investigation of . . . [d]efendant, and/or [MOD's] cooperation and any potential benefit that MOD could potentially or did in fact derive therefrom; and
>
> c. Identify and produce to [d]efendant all communications between the State and the law firm of Calcagni & Kanefski, LLP, and any of its attorneys, related to MOD, his potential liability, cooperation credit and other benefits related to his cooperation with the State, sentencing, his own potential criminal liability, and all internal assessments thereof.

The State moved for clarification and/or reconsideration of certain provisions of the September 27, 2024 order and requested a stay.  The judge

---

[9]  The judge also addressed compelling the production of the identities of co-conspirators, which is not at issue in the present appeal.

granted a temporary stay. Over the next several months, the parties argued over the production of various documents during status conferences conducted in October, November, and December 2024, as well as January 2025. Defendant sought the balance of the text messages sent after the message, "Is Ho with you?" and argued the State provided only "cherry picked" materials. Defendant also challenged the privilege log submitted by the State as insufficient. The State defended its privilege log and invoked the work-product privilege.

On February 25, 2025, the judge heard argument on the State's motion for clarification and/or reconsideration. The State asserted by providing the balance of the texts and internal emails as ordered by the court, it provided sufficient evidence showing the consensual intercept was valid and any further disclosure of communications would be cumulative and a "fishing expedition." Defendant retorted the discovery order required the State to produce all communications, and the information provided was insufficient to challenge the consensual intercept as based on "whim."

The judge rejected the State's arguments. In an oral opinion, the judge ruled paragraph 3(a) was not overbroad, explaining:

> [t]he communications in question are directly relevant
> to the investigation and prosecution of . . . defendant,
> especially given the nature of the consensual intercepts
> as a core element of this case.

These materials must be disclosed to ensure that . . . defendant can adequately evaluate the evidence against him. While the State's concerns about the potential scope of production are noted, . . . defendant's due process rights which require full access to exculpatory and impeachment materials outweigh the State's generalized objections.

As to paragraph 3(b), the judge refused to reconsider, finding the provision was not overbroad because "[a]nything . . . communicated as a benefit to [MOD was] relevant to this defendant" as it went to MOD's "credibility." As to paragraph 3(c), the judge agreed with the State that the provision was "over[]broad, unless it was communicated directly to MOD or to their attorneys."

On March 7, 2025, the judge memorialized her oral opinion and issued a written order granting the motion in part and denying the motion in part.[10] The order denied reconsideration of paragraphs (a) and (b), but granted in part reconsideration of paragraph (c).[11] As to paragraph (c), the order required the State "to identify all . . . internal assessments[] and submit a privilege log as to internal assessments not subject to disclosure." The order further provided "to

---

[10] On March 18, 2025, the judge issued an amended order correcting a typographical error.

[11] The other subparts of the order are not pertinent to this appeal.

A-2645-24

the extent the State asserts a privilege over any documents the [c]ourt has directed the State to produce . . . , the State shall submit such documents to the [c]ourt in camera with an accompanying privilege log in a form compliant with [Rule] 3:10-2."

On March 12, 2025, the judge denied the State's request for a stay. On March 25, 2025, the State again moved for a stay or extension of time to comply with the March 7 discovery order. On April 2, 2025, the judge extended the time to comply with the order to April 28, 2025. Thereafter, the State moved for leave to appeal parts of the March 7 order and for a stay of the March 7 order. We granted both motions.

On appeal, the State raises the following points for our consideration:

> POINT I
>
> DEFENDANT HAS SHOWN NO BASIS TO OBTAIN DISCOVERY OF ALL COMMUNICATIONS "RELATED TO" ALL CONSENSUAL INTERCEPTS.
>
> POINT II
>
> DEFENDANT HAS SHOWN NO BASIS TO OBTAIN INTERNAL INVESTIGATOR COMMUNICATIONS.
>
> POINT III
>
> DEFENDANT HAS SHOWN NO BASIS TO OBTAIN ALL "INTERNAL ASSESSMENTS" ABOUT MOD.

16

## II.

We "generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law." State v. Ramirez, 252 N.J. 277, 298 (2022) (quoting State v. Brown, 236 N.J. 497, 521 (2019)). "A trial court can abuse its discretion 'by failing to consider all relevant factors.'" Ibid. (quoting State v. S.N., 231 N.J. 497, 500 (2018)). We "will set aside or modify such decisions if they do not comport with the applicable law or do not give sufficient regard to pertinent considerations." Ibid. On the other hand, "our review of the meaning or scope of a court rule is de novo." State v. Hernandez, 225 N.J. 451, 461 (2016).

"[O]ur 'rules of discovery . . . are designed to accomplish fairness.'" State v. Desir, 245 N.J. 179, 203 (2021) (omission in original) (quoting State v. Bellamy, 329 N.J. Super. 371, 376 (App. Div. 2000)). "The principal purpose of our discovery rules is to assure the parties every legitimate avenue of inquiry prior to trial to enhance the search for the truth." State v. Burnett, 198 N.J. Super. 53, 58 (App. Div. 1984). As such,

> [i]n New Jersey, an accused has a right to broad discovery after the return of an indictment in a criminal case. State v. Scoles, 214 N.J. 236, 252 (2013). This state's "open-file approach to pretrial discovery in

17

criminal matters" is intended "[t]o advance the goal of providing fair and just criminal trials." Ibid. The metes and bounds of the State's discovery obligation to the defense is found in Rule 3:13-3(b), which states that "[d]iscovery shall include exculpatory information or material" and "relevant material," including all items set forth in ten separate categories.

[Hernandez, 225 N.J. at 461-62 (alterations in original).]

The categories of Rule 3:13-3(b) requiring the disclosure of relevant material to the defense directly germane to this case are:

(E) books, papers, documents, or copies thereof, or tangible objects, buildings or places which are within the possession, custody or control of the prosecutor, including, but not limited to, writings, drawings, graphs, charts, photographs, video and sound recordings, images, electronically stored information, and any other data or data compilations stored in any medium from which information can be obtained and translated, if necessary, into reasonably usable form;

(F) names, addresses, and birthdates of any persons whom the prosecutor knows to have relevant evidence or information including a designation by the prosecutor as to which of those persons may be called as witnesses;

(G) record of statements, signed or unsigned, by such persons or by co-defendants which are within the possession, custody or control of the prosecutor and any relevant record of prior conviction of such persons. . . . [;]

18

(H) police reports that are within the possession, custody, or control of the prosecutor.

[R. 3:13-3(b)(1)(E)-(H).]

It is undisputed that "discovery in a criminal case 'is appropriate if it will lead to relevant' information." Hernandez, 225 N.J. at 462 (emphasis omitted) (quoting State v. Ballard, 331 N.J. Super. 529, 538 (App. Div. 2000)). In the discovery context, "[r]elevance is measured in terms of the opportunity of the defendant to present a complete defense." Pressler & Verniero, Current N.J. Court Rules, cmt. 3.2 on R. 3:13-3 (2026). "Relevancy is the hallmark of admissibility of evidence." State v. Darby, 174 N.J. 509, 519 (2002). "Evidence is relevant if it 'ha[s] a tendency in reason to prove or disprove any fact of consequence to the determination of the action." Hernandez, 225 N.J. at 462 (alteration in original) (quoting N.J.R.E. 401).

> The State's discovery obligation also extends to providing "material evidence affecting [the] credibility" of a State's witness whose testimony may be determinative of guilt or innocence. State v. Carter, 69 N.J. 420, 433 (1976) (citing Giglio, 405 U.S. 150). Thus, the State must disclose any promise of favorable treatment or leniency offered to a witness, including any plea or cooperation agreement setting forth the benefits to the witness.
>
> [Hernandez, 225 N.J. at 462-63 (citation reformatted).]

A-2645-24

The State is also duty bound to disclose evidence potentially favorable to the defense. Brady, 373 U.S. at 87. The evidence need not be directly exculpatory if it has value for impeachment purposes. State v. Nash, 212 N.J. 518, 544 (2013). "A breach of this duty of disclosure—in appropriate circumstances—violates a defendant's due process rights." Ibid. (citing Brady, 373 U.S. at 87). However, "[t]he Brady disclosure rule applies only to information of which the prosecution is actually or constructively aware." State v. Nelson, 155 N.J. 487, 498 (1998).

"While discovery in criminal cases is broad, it is not unlimited." Hernandez, 225 N.J. at 463 (citing State v. D.R.H., 127 N.J. 249, 256 (1992)). "However expansive our discovery rule and jurisprudence may be, they do not sanction rummaging through irrelevant evidence." Ibid.

> "For example, defendants cannot transform the discovery process into an unfocused, haphazard search for evidence." [D.R.H., 127 N.J. at 256]; see also State v. R.W., 104 N.J. 14, 28 (1986) ("[A]llowing a defendant to forage for evidence without a reasonable basis is not an ingredient of either due process or fundamental fairness in the administration of the criminal laws.").
>
> [Hernandez, 225 N.J. at 463 (second alteration in original).]

A-2645-24

Pursuant to Rule 3:13-3(d), "a party's work product" is not subject to disclosure. The Rule "does not require discovery of a party's work product consisting of internal reports, memoranda[,] or documents made by that party or the party's attorney or agents, in connection with the investigation[ or] prosecution . . . of the matter." Ibid.

The work-product privilege is designed to protect from pretrial disclosure an attorney's mental processes and litigation strategies. State v. Mingo, 77 N.J. 576, 584 (1978) (citing State v. Montague, 55 N.J. 387, 401 (1970)). It "prohibits disclosure of certain materials prepared by an attorney in anticipation of litigation, and thereby 'creates a zone of privacy in which an attorney can investigate, prepare, and analyze a case.'" State v. DeMarco, 275 N.J. Super. 311, 316 (App. Div. 1994) (quoting In re Grand Jury Subpoena Dated Nov. 8, 1979, 622 F.2d 933, 935 (6th Cir. 1980)).

Still, the work-product privilege "is not absolute." United States v. Nobles, 422 U.S. 225, 239 (1975). It may be overcome through a strong showing of need that the information sought is both relevant and necessary to a fair determination of the issues. State v. Mitchell, 164 N.J. Super. 198, 202 (App. Div. 1978).

Similarly, "[t]he deliberative[-]process privilege is a doctrine that permits the government to withhold documents that reflect advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." In re Liquidation of Integrity Ins. Co., 165 N.J. 75, 83 (2000). The privilege "is rooted in the notion that the sovereign has an interest in protecting the integrity of its deliberations." Ibid.

Under the doctrine, the document the government seeks to protect must be: 1) "generated before the adoption of an agency's policy or decision"; and 2) "deliberative in nature, containing opinions, recommendations, or advice about agency policies." Id. at 84-85. "Purely factual material that does not reflect deliberative processes is not protected." Id. at 85. However, "a record, which contains or involves factual components, is entitled to deliberative-process protection when it was used in the decision-making process and its disclosure would reveal deliberations that occurred during that process." Educ. L. Ctr. v. N.J. Dep't of Educ., 198 N.J. 274, 280, 299-300 (2009).

"[A] litigant may obtain deliberative[-]process materials if [their] need for the materials and the need for accurate fact-finding override the government's significant interest in non-disclosure." In re Liquidation of Integrity Ins. Co.,

165 N.J. at 85. However, "[a]s with any privilege, the party seeking such documents bears the burden of showing a substantial or compelling need for them." Ibid. To determine whether the privilege has been overcome, the court considers "1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." Id. at 85-86. The deliberative-process privilege is generally overcome only in "exceptional cases." Id. at 85.

"[O]ur trial courts are empowered to order discovery beyond that mandated by our court rules when doing so will further the truth-seeking function or ensure the fairness of a trial." Hernandez, 225 N.J. at 463 (quoting State in re A.B., 219 N.J. 542, 560 (2014)). "Whether discovery should be expanded involves exercising judicial discretion . . . [by] balancing the beneficial effects of discovery against its disadvantages." State ex rel. W.C., 85 N.J. 218, 221 (1981). In evaluating such requests, a trial court should consider whether the evidence would contribute to an adequate defense, and whether the evidence could be obtained from other sources. A.B., 219 N.J. at 555. "When a defendant seeks discovery outside of the categories permitted by our court rules, he [or she] bears the burden of establishing need." Ibid.

Here, paragraph 3(a) of the discovery order required the State to provide:

> all communications, including but not limited to emails and text messages, by, between, and among the State's investigators, DAGs and any third parties, that are related to the consensual intercepts and/or consensual intercept authorizations that were sought and/or authorized in the investigation of . . . [d]efendant.

The State challenges the entire paragraph, arguing it provided enough information to show the wiretap satisfied the statutory requirements and defendant failed to "articulate how" the disclosure "will lead to relevant information" as required under Hernandez, 225 N.J. at 466. The State further asserts defendant has provided no viable theory for why an intercept was not properly authorized and it provided enough information to dispel defendant's theory that the April 23, 2018 intercept was improper based on the timing of the intercept and the requesting officer not working that day. The State also contends the information is subject to the work-product and deliberative-process privileges and providing a privilege log of the "voluminous" communications would be unduly burdensome.

Defendant counters the requested discovery falls under Rule 3:13-3(b)(1)(H), which makes police reports explicitly discoverable. According to defendant, because he is seeking "facts" that would be found in police reports, the State's failure to include the information contained in the emails and text

A-2645-24

messages in a police report does not take the information outside the ambit of the Rule. Defendant also argues the State "has made intra-agency communications relevant and subject to disclosure" pursuant to Rule 3:13-3 by producing the emails and texts. Finally, defendant asserts the State's privilege argument is inapplicable but to the extent any privilege applies, the State waived it when it disclosed the emails and text messages. In the alternative, defendant contends if the discovery is outside the scope of Rule 3:13-3, this court's holding in Martinez subjects it to disclosure because defendant has a right to challenge the basis of his intercept. Finally, defendant asserts any argument production would be unduly burdensome is not properly before this court as it was not raised in the trial court.

To address the issue, we must examine the law governing consensual intercepts. The Wiretap Act states:

It shall not be unlawful under this act for:

. . . .

c. Any person acting at the direction of an investigative or law enforcement officer to intercept a wire, electronic[,] or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception; provided, however, that no such

25

interception shall be made without the prior approval of the Attorney General or [their] designee or a county prosecutor or [their] designee.

[N.J.S.A. 2A:156A-4(c).]

N.J.S.A. 2A:156A-21 delineates the circumstances under which an aggrieved person may move to suppress the contents of an intercepted communication as follows:

a. The communication was unlawfully intercepted;

b. The order of authorization is insufficient on its face;

c. The interception was not made in conformity with the order of authorization or in accordance with the requirements of [N.J.S.A. 2A:156A-12].

[N.J.S.A. 2A:156A-21.]

"[P]rosecutors who review proposed consensual interceptions under Section 4 typically apply a baseline standard of 'relevance.'" Martinez, 461 N.J. Super. at 272. "That sign-off requirement presumably exists because an attorney will be in a better position than, say, a police officer to balance issues of constitutional rights, attorney ethics, or the possible disclosure of privileged communications or work product against the legitimate needs of an ongoing criminal investigation." Id. at 275. Indeed, in Martinez, we agreed "intercepts should not be pursued unless they are expected to yield relevant information,"

26

<u>ibid.</u>, and we stressed "that the approval process must satisfy some standard other than unfettered discretion," <u>id.</u> at 272.

We reasoned:

> Interpreting the Wiretap Act to enable unfettered and unreviewable discretion by prosecutors could render the prior authorization requirement merely a perfunctory task. If an official can review a request for a consensual wiretap and approve it based on any reason — including, hypothetically, a whim, bias, or personal animus — then the approval process would serve no real purpose. This is particularly so if, as the State contends, the approval is never subject to judicial review. We decline to adopt that categorical legal position.
>
> [<u>Ibid.</u>]

It stands to reason that where there is a credible allegation of impermissible motive in the authorization or issuance of a consensual intercept, discovery is permitted to assess what information was provided to the decision-maker before approval, when and under what circumstances approval was given, or how the reviewing official balanced the legitimate need for investigation against the competing concerns of privacy, work product, and constitutional rights. <u>See</u> <u>id.</u> at 275-76.

Applying these principles, we discern no error in the portion of paragraph (a) of the discovery order requiring disclosure of all communications related to

27

the April 23, 2018 consensual intercept and/or consensual intercept authorization sought and/or authorized in defendant's investigation. Although the discovery is outside the scope of <u>Rule</u> 3:13-3, the communications supporting the authorization of the April 23 consensual intercept is relevant to defendant's challenge to the lawfulness of the intercept. However, we discern no basis to require the State to produce all communications pertaining to the remaining consensual intercepts, and defendant has advanced no viable ground to require them.

The State argues internal communications concerning an investigation are "generally shielded from discovery as work product" and "reflect deliberations concerning prosecutorial policies regarding investigations." As no specific documents are challenged, to accept the State's position would require us to categorically classify all internal communications regarding consensual intercepts as subject to the work-product and deliberative-process privilege. We decline to do so. <u>See</u> <u>Ballard</u>, 331 N.J. Super. at 551 ("[T]here is no blanket privilege protecting investigative files, deliberative materials or intra-agency memoranda."). However, our decision does not preclude the State from submitting a privilege log to the trial court as to individual communications.

Paragraph 3(b) of the discovery order required the State to provide:

> All intra-agency communications, including but not limited to emails and text messages by, between[,] and among the State investigators, or between State investigators and any third parties, related to . . . [d]efendant and the investigation of . . . [d]efendant, and/or [MOD's] cooperation, and any potential benefit that MOD could potentially or did in fact derive therefrom.

The State reiterates the communications subject to paragraph 3(b) are outside the scope of Rule 3:13-3 and protected by the work-product and deliberative-process privileges.[12] The State further contends defendant failed to "establish[] any threshold relevance for these communications."

Hernandez is instructive on this point. In Hernandez, the defendants were charged in a State Grand Jury indictment with several drug related offenses. 225 N.J. at 454. The charges stemmed from allegations that on three separate occasions, the defendants sold, in all, over five ounces of cocaine to a witness who was cooperating with law enforcement officials in the defendants' case and several other unrelated cases. Ibid. In discovery, the defendants "were given the agreements between the State and the [cooperating w]itness in [their] case

---

[12] The State notes in its merits brief that it produced "all of the communications between investigators and third parties" to "avoid further litigation" but still challenges paragraph 3(b).

and in unrelated cases, and the State ha[d] represented that it [would] provide the defense with any known material false statements made by the [w]itness in those cases." Id. at 453. The "[d]efendants nevertheless insist[ed] that they [were] entitled to every statement made by the [w]itness in each case in which he ha[d] cooperated with the State, whether those statements are contained in a transcribed interview, recorded drug transaction, investigative report, or memorandum between members of the prosecutorial team." Ibid.

The trial court determined, notwithstanding its "lack of relevance" to the present matter, the information was discoverable under our court rules. Id. at 457. The court ordered its production, including "internal law enforcement emails mentioning the [w]itness and emails between the [w]itness's attorney and law enforcement officials." Id. at 457-58. We affirmed the trial court's discovery order, noting that broad discovery is permitted under Rule 3:13-3, and the "discovery [was] rationally related to [the] defendants' right to confront a key state witness as to potential bias, prejudice[,] or motive and [was] relevant for that purpose." Id. at 458.

Our Supreme Court reversed, explaining:

> We hold that the discovery ordered by the trial court and Appellate Division exceeds the limits of Rule 3:13-3(b) and is not supported by our jurisprudence. Although our discovery rule generally requires that the

State provide all evidence relevant to the defense of criminal charges, it does not open the door to foraging through files of other cases in search of relevant evidence. The only information discoverable in the unrelated cases that is relevant to the defense at this point are the cooperation agreements between the State and the [w]itness and any violations of the agreements, such as material false statements made by the [w]itness and known to the State. The discovery order here requires disclosure of information not mandated by our discovery rule—information that has no ostensible relevance to the case to be tried.

[Hernandez, 225 N.J. at 453-54.]

The Court acknowledged the special concerns when dealing with cooperating witnesses, stating:

We fully understand that the reliability of State informants and cooperating witnesses must be subject to special scrutiny because the charge-reduction and sentence-reduction incentives given to such witnesses have the capacity to induce false testimony. That is why the State is required to make complete disclosure of the cooperation and plea agreements. Through [the] defendants' cross-examination and summation, the jury will know that the [w]itness has a powerful reason to curry favor with the State. In addition, the State is required as part of its discovery obligation to disclose known material false statements made by the [w]itness in the unrelated investigations because such disclosures bear on whether the State is enforcing or altering its cooperation agreement.

[Id. at 468.]

Nonetheless, the Court stressed the defendants were not permitted to forage through the State's files, "hoping to snare some morsel of information that may be helpful to the defense" without articulating "how the disclosure of documents in the unrelated investigations will lead to relevant or admissible evidence." Id. at 466 (emphasis omitted).

Here, under Rule 3:13-3(b), defendant is undoubtedly entitled to investigative reports related to the charge lodged against him and the State's investigation of him. Defendant is also entitled to MOD's cooperation agreement with the State related to defendant's case, including any potential benefit derived therefrom. However, paragraph 3(b) of the discovery order erroneously requires disclosure of information not mandated by our discovery rule and defendant has not articulated how disclosure of "[a]ll intra-agency communications, including but not limited to emails and text messages" will lead to relevant or admissible evidence.

In reaching this conclusion, we are guided by Hernandez, where the Court sanctioned the State providing the defense with:

> the [w]itness's name, his statements to law enforcement authorities, his criminal history, his plea and cooperation agreements, audio recordings of the alleged drug transactions, the report of the forensic analysis of the cocaine allegedly sold by defendants,

and investigative reports concerning the alleged offenses committed by defendants. See R. 3:13-3(b).

[Hernandez, 225 N.J. at 464.]

Defendants are not permitted to conduct a "fishing expedition," or "transform the discovery process into an unfocused, haphazard search for evidence." Ramirez, 252 N.J. at 296 (first quoting R.W., 104 N.J. at 28; then quoting D.R.H., 127 N.J. at 256).[13]

Paragraph 3(c) of the discovery order required the State to provide

all communications between the State and the law firm of Calcagni & Kanefski, LLP, and any of its attorneys, related to MOD, his potential liability, cooperation credit and other benefits related to his cooperation with the State, sentencing, his own potential criminal liability, and all internal assessments thereof.

The State only challenges the portion of the order requiring it to produce "all internal assessments thereof," arguing internal assessments could not influence MOD's credibility because he was unaware of them. The State also reiterates its contention that the information is subject to the work-product and deliberative-process privileges. The judge agreed internal assessments could

---

[13] Based on our decision, we need not address the State's argument that the information contained in paragraph 3(b) is subject to the work-product and deliberative-process privileges.

A-2645-24

not affect MOD's credibility if he never learned about them, but still required the communications be identified and logged.

"Defendants have 'a right to explore evidence tending to show that the State may have a "hold" of some kind over a witness, the mere existence of which might prompt the individual to color his testimony in favor of the prosecution.'" Hernandez, 225 N.J. at 465 (quoting State v. Bass, 224 N.J. 285, 302 (2016)). "Thus, defendant is entitled to information concerning any violation of the cooperation agreements, including disclosure of material false statements made by the witness and known to the State." Ibid.

We believe any "internal assessments" of communications between the State and MOD's attorneys related to MOD's cooperation that are not memorialized in an investigation report or witness statement would be excluded from discovery under Rule 3:13-3(d) as a party's work product. Accordingly, we reverse that portion of paragraph 3(c).[14]

We decline to address the State's argument that producing the communications would be unduly burdensome. First, our holding has mitigated much of the State's burden. Second, the State did not raise the argument in the

---

[14] Rule 3:13-3(b)(1), along with Brady and its progeny, would also require disclosure of exculpatory information and all other information relevant to a legitimate defense. Hernandez, 225 N.J. at 466 n.1.

34

trial court. "It is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the question so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (quoting Reynolds Offset Co., Inc. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959)); see also State v. Robinson, 200 N.J. 1, 20 (2009) (same). Neither issue is implicated here.

In summary, first, we agree there is no error in requiring the State to produce all communications related to the April 23, 2018 intercept or its authorization in paragraph 3(a). However, defendant fails to advance a viable ground to require the State to produce all communications pertaining to the remaining consensual intercepts, and therefore we discern no basis to require the State to produce them. Second, we reverse paragraph 3(b) to the extent it requires disclosure of information beyond the scope of Rule 3:13-3(b) and is not otherwise authorized by our discovery rule. Third, we reverse the portion of paragraph 3(c) requiring disclosure of work product in the form of "internal assessments" not memorialized in an investigative report or a witness statement.

Affirmed in part, and reversed in part. We remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-2645-24